186.    In its post-Report letter, E&Y indicated that a "tea leaf inventory rollfoward" was necessary.  E&Y proposed that its own representatives both prepare and mail confirmations of tealeaf transactions.  The confirmations would then be used to reconcile the inventory rollforwards.  E&Y further indicated the need for additional information regarding the barter transactions.

187.    E&Y never received the information required for a new inventory rollforward or independent corroboration of the bulk tea transactions.

188.    E&Y *never* got the required information from Le Nature's, *never* performed a new inventory rollforward, *never* sent out new confirmations for the bulk tea transactions, and *never* got the required information for the purported barter transactions.  Thus, according to E&Y's own statements, E&Y could not resolve its concerns with the audited financial statements and could not permit the Company to use those statements any longer.

189.    Instead, when E&Y finally demonstrated that it was capable of acting independently by requesting information needed to confirm its earlier-issued audit report, it was summarily terminated as the outside auditor.

190.    Beyond its correspondence with Podlucky – the principal architect of the fraudulent transactions – E&Y never notified a single person that its audit report could no longer be relied upon or that the accompanying financial statements were materially misstated.  E&Y was required to notify the Company's board of directors that its concerns had not been resolved.  But it did not do so.  Moreover, E&Y knew that its audit report and the audited financial statements had been relied upon, and were still being relied upon, by holders of Le Nature's' Notes.  E&Y knew that its audit report was prepared specifically to enable the Note Offering, and that the audit report and accompanying financials were appended directly to the Offering Memorandum.  Yet E&Y never notified any of the Noteholders, and never disclosed to the bond market, that its past audit opinions were no longer reliable.

191.    Indeed, notwithstanding its own recognition that its audit report was no longer reliable and that it had not done the necessary testing to reevaluate that report, E&Y expressly

permitted BDO to use the 2002 financial statements that it audited as part of BDO's audit work and audit report for fiscal year 2003.

192. The statements in E&Y's audit report appended to the Offering Memorandum were false. E&Y knew that those statements were false. And E&Y knew that the Noteholders and other participants in the bond market were relying upon the statements in E&Y's certified report. Yet, even after reviewing the Report and failing to conduct the very follow-up procedures that it acknowledged were required, E&Y failed to take reasonable steps to correct or withdraw its opinions and the accompanying financial report.

**Wachovia's Origination Division Continues to Brush Aside Evidence of Fraud After the CFO's Abrupt Resignation**

193. Following Higbee's abrupt and unexpected resignation, Wachovia's Sales Division once again voiced its concerns about Le Nature's. Higbee had worked for decades as an auditor at Arthur Andersen LLP and was hired by Le Nature's (along with a colleague from Andersen) in 2002 to lend credibility to the Company's management team. News of his resignation sent shockwaves through Wachovia's Sales Division. As one former member of the Division explained, it is always pretty horrifying when a chief financial officer leaves for no reason, making this a very scary event. Higbee's departure was even more disturbing, given his role in providing legitimacy to Le Nature's' financial management team and his expressly articulated concerns with Le Nature's' accounting practices in his resignation letter.

194. The Wachovia Sales Division, which was at that time making a market by actively trading Le Nature's Notes, discussed its concerns with the Origination Division. The Sales Division knew that the Noteholders and potential investors would raise questions about Le Nature's, and it knew that it would be making representations to those investors regarding Le Nature's' financial health and integrity. Because the Origination Division (and, in particular, Grant Rice) had the closest relationship with Le Nature's, the Sales Division sought its assistance to obtain the best information concerning Higbee's resignation. But when the Sales Division questioned the bankers in the Origination Division about the departure, it was, once again, told simply to "trust" Origination's view that the chief financial officer's departure was being

adequately handled by the Company. The Sales Division, which was very scared about the developments at Le Nature's, had hit a stone wall; Wachovia simply would not provide its own salesmen with further information that was already in Wachovia's possession and easily within its ability to obtain from the Company. Notwithstanding these serious issues, the Sales Division continued to sell Le Nature's Notes, and Wachovia continued to structure and place a series of further financings for the Company.

**Wachovia's Relationship With Le Nature's Intensifies After the 2003 Resignations**

195. Following the resignations of Le Nature's' chief financial officer and other key financial managers, Wachovia continued to work closely with Podlucky, Lynn, and their colleagues to raise increasingly more money for Le Nature's. Far from being deterred by the "very scary event" acknowledged by its own bankers, Wachovia pressed ahead to earn more fees and perpetuate Le Nature's' fraudulent conduct.

***1) May 2004 "Add-On" Facility***

196. In May 2004, Wachovia arranged and marketed another $75 million loan facility to be added to the pre-existing $100 million revolver. In connection with the new loan and its syndication, Wachovia prepared a Confidential Information Memorandum that it distributed to potential lenders. The memorandum touted Le Nature's' purported net sales from 1999 through 2003: $28 million in 1999, $40 million in 2000, $84 million in 2001, $135 million in 2002, and $159 million in 2003.

197. The net sales figures in the Wachovia materials were materially false. As uncovered by the court-appointed custodian in October 2006, Le Nature's' net sales were as low as $32 million *even after the expansion of the Company's production capacity* with the completion and operation of its Phoenix facility. The chapter 11 trustee later determined that 2005 sales were only $28.2 million. Clearly, net sales could not have reached anything even close to the levels reported by Wachovia in earlier years. Indeed, the sales figures determined by the chapter 11 trustee, and reported in amended federal income tax returns, were only a small fraction of the sales levels included in Wachovia's materials. Sales in excess of $100 million, such as Wachovia reported for 2002 and 2003, were simply fanciful. Wachovia's memorandum further stated that

the Company's 2003 EBITDA was $61.1 million, reflecting a compound annual growth rate of 55.0% since 1999. These numbers were also without basis in reality.

198. On April 20, 2004, Wachovia and Le Nature's made a presentation in New York City to potential lenders with respect to the May 2004 Add-On Facility. The cover slide for the presentation proudly showed authorship by "Wachovia Securities." Jerry Hullinger, a Wachovia director, initiated the presentation by providing a "Transaction Overview." He was accompanied by several Le Nature's executives, including Podlucky, David Getzik (then chief financial officer), and Robert Lynn (executive vice president), who reiterated the financial results set forth in the Wachovia marketing materials. Following this presentation, Ted Swimmer, a Wachovia managing director, provided a "Syndication Overview," in which he discussed the logistics of the loan and its anticipated closing. As part of his presentation, Swimmer reviewed an "asset coverage calculation" detailing the available collateral for the loan, including a description of Le Nature's' purportedly then-existing accounts receivable and inventory. The financial information presented by Wachovia and Le Nature's' managers was materially flawed, including a substantial overstatement of the asset-to-debt ratio.

199. In May 2004, Wachovia originated and provided the $75 million add-on term loan to Le Nature's, which was used to pay outstanding debt due to Wachovia Bank under the pre-existing revolver.

***2) December 2005 "Add-On" Facility***

200. In late 2005, Le Nature's again called upon its investment bankers at Wachovia to raise new capital for the Company; this time, a $100 million add-on term loan facility to supplement the pre-existing loans. Once again, Wachovia prepared a detailed Confidential Information Memorandum, which it distributed to potential lenders in the new facility. Among other things, the offering memorandum made specific representations regarding Le Nature's' net sales, gross profit, EBITDA, accounts receivable, inventory, debt, and debt service obligations, much of which was false. For example, Wachovia's offering memorandum reported:

- For the 12 months leading up to September 30, 2005, Le Nature's generated net sales of $271.6 million and EBITDA of $112.3 million, "resulting in an EBITDA margin of 41.4%, its highest level since the Company began operations."

Exhibit A
Page 59

- Compound annual net sales growth from 2000 through the last twelve months period ending September 30, 2005, was 49.3%.
- Since 2003, EBITDA has increased by 98%.
- For the 12-month period ending on September 30, 2005, Le Nature's sold 69.2 million cases of its product, reflecting compound annual growth of 70.9% from 2001.

201. On December 6, 2005, Wachovia and Le Nature's made a presentation to potential lenders, at the New York Palace Hotel, similar to the April 2004 presentation. As with other presentations, the cover slide proudly displayed the "Wachovia Securities" name and logo. Wachovia's Jerry Hullinger again initiated the presentation, which was organized and run by Wachovia, with a "Transaction Overview" that touted the strength of asset coverage for the loan (based, in part, on Le Nature's' then-existing accounts receivable and inventory). Hullinger also emphasized the Company's strong sales growth and continued margin improvement. During the presentation, prospective lenders were provided with information similar to that set forth in Wachovia's offering memorandum, including the exaggerated sales and EBITDA numbers. Podlucky, Lynn, and David Getzik attended the presentation on behalf of Le Nature's and helped Wachovia present extensive and materially false financial information to the lenders.

202. As a consequence of Wachovia's efforts, Le Nature's was successful in obtaining the $100 million add-on loan in December 2005, and Wachovia earned millions of dollars in fees in connection therewith. From and after December 2005, Wachovia's affiliate, Wachovia Bank, continued to act as administrative agent for Le Nature's' secured lending facilities, which thereafter totaled $275 million dollars.

203. The proceeds of the $100 million add-on loan were used to pay and satisfy the then approximately $83 million in outstanding indebtedness due under Le Nature's' $100 million revolver, including debt due to Wachovia Bank. Thus, Wachovia Bank's $25 million exposure under the revolver was eliminated by funding of the new term loan.

204. As the direct result of Wachovia's efforts, Le Nature's' long-term secured debt increased from approximately $40 million in 2003 to $171 million in 2005. This lending substantially leveraged Le Nature's' assets and balance sheet and permitted it to continue funding

its operations and purported expansion, to present the image of a thriving, growing company to the public and the business community, and to fuel its ever-expanding fraud.

***3) Project Palmer: Wachovia's Efforts to Sell Le Nature's***

205. In 2005 and 2006, Podlucky, Le Nature's, and Wachovia initiated efforts to pursue a liquidity event that would result in the sale of Le Nature's, satisfaction of the Company's secured debt, a payout to its shareholders, and even more millions of dollars in fees for Wachovia.

206. To that end, in April 2005, the Le Nature's board of directors established the Project Palmer Committee and charged it with reviewing and maintaining information regarding proposed sale transactions. Podlucky and the Project Palmer Committee worked closely with Wachovia to solicit potential buyers for Le Nature's. In connection with the effort, Wachovia convened its own team of senior officers to work with Le Nature's on a sale of the Company, hoping to achieve another substantial fee for Wachovia.

**Wachovia's Knowledge of Le Nature's' Fraud Becomes Even Clearer Before Le Nature's' Demise**

***1) Wachovia Was Directly Advised of Le Nature's' Problems in Trying to Sell the Company***

207. As one aspect of Project Palmer, throughout the second half of 2005 and into early 2006, Wachovia solicited potential buyers and conducted presentations to many potential acquirers. Several of the potential buyers undertook due diligence on Le Nature's and directed their questions and concerns to Wachovia. At least one of the potential buyers, GTCR Golder Rauner, LLC ("GTCR"), raised serious concerns about Le Nature's including, on information and belief, issues with its reported wholesale product pricing.

208. Although, on information and belief, GTCR raised the pricing issue directly with Wachovia, Wachovia knew that Le Nature's would never be able to provide answers to GTCR's issues. Rather, in April 2006, Podlucky reported that GTCR "was not going to provide [the] value we were looking for" and broke off discussions with GTCR. On information and belief, other potential buyers identified similar price discrepancies.

209. Accordingly, in its attempt to solicit buyers for Le Nature's, Wachovia was presented with serious and disturbing questions from potential buyers that directly challenged the

Company's financial and managerial integrity. Although Wachovia was aware of these problems, it did not disclose them to Le Nature's' lenders or Noteholders, and they did not prevent Wachovia from issuing positive public reports about the Company and its Notes.

***2) Wachovia Encouraged Its Bank Affiliate to Hide Le Nature's' Dire Financial Situation by Fronting Interest Payments to Syndicate Lenders***

210. Throughout 2006, Wachovia was also acutely aware – and concealed from others, including even other existing lenders to Le Nature's – that Le Nature's was suffering serious cash flow problems. As the Administrative Agent for the existing credit facility, Wachovia's banking affiliate, Wachovia Bank, was charged with collecting interest payments from Le Nature's and distributing them to the syndicate lenders. Le Nature's, however, was habitually late with the interest payments – it was unable to timely satisfy obligations on its most senior credit facility. Wachovia knew that disclosure of such payment problems would jeopardize any future financings, issuances, or deals for Le Nature's (and thereby jeopardize the associated fees for Wachovia). To hide the problem, Wachovia actually fronted the interest payments to the syndicate lenders; that is, it paid out interest before collecting the payments from Le Nature's. This procedure was remarkably atypical, and was motivated solely by Wachovia's desire to keep Le Nature's' financial straits hidden from the other lenders and other interested parties, including the Noteholders.

211. In March 2006, for example, Wachovia Bank paid out nearly $1.9 million in interest, despite failing to obtain the payment from Le Nature's. Sue Patterson, the Wachovia Bank employee charged with collecting interest from Le Nature's (who apparently was not advised of Wachovia Bank's purpose in fronting the payments), complained that "[a]nytime there is LIBOR interest due or interim interest due the company does not seem to be in a big hurry to pay me." She noted her frustration with the situation: "It's very frustrating when I have to pay the bank group on the payment due dates and then try to recover funds WBNA is out for the time period in which we are awaiting the funds."

212. Even Patterson, however, was not fully in the dark. In an e-mail complaint about the interest situation, which was forwarded to bankers in Wachovia's Origination Division,

Patterson explained, "I try to jump through hoops for this company to keep Greg [Podlucky] happy so I would appreciate it if they could pay on time."

213. Le Nature's' failure to make timely interest payments was not an isolated event; it continued throughout 2006. Indeed, on August 29, 2006 – just days before Wachovia put yet another credit facility into effect – Le Nature's was still behind on its interest payments. Wachovia never disclosed this serious indication that Le Nature's was struggling to stay afloat.

***3) Wachovia's Own Analysts Were Identifying Disturbing Issues***

214. As set forth below, over the span of several years, analysts in Wachovia's Sales Division regularly issued glowing reports about Le Nature's' business, repeatedly assigning an "Outperform" rating to the Company. Wachovia's analysts were aware of Le Nature's' problems, however, long before the Company's demise. And the analysts' questions to Origination Division bankers in the days just before completion of the new credit facility in September 2006 make clear that the Sales Division was aware of Le Nature's' improper conduct and ailing financial situation.

215. In April 2006, Bryan Hunt, a Wachovia director and the head of high-yield research for Food & Beverage, Food Retailing, and Restaurants, sent an e-mail to Le Nature's' executive vice president noting that Le Nature's' products were not being stocked in retail stores. Among other things, Hunt noted that (i) flavored water had been removed from the shelves at southeast Kroger stores, (ii) Dazzlers were removed at Target stores, (iii) and other stores were showing weak "sales tempo" and "very little product" for Le Nature's.

216. On August 29, 2006 – the day before Wachovia actively sought lenders to buy up the new credit facility – Hunt sent an e-mail to several investment bankers in Wachovia's Origination Division highlighting more (and more severe) problems at Le Nature's. Titled "Questions that need to be answered . . . ," Hunt's e-mail stated, among other things:

- "Why is the company's interest exposure roughly $4MM a quarter over the last 10 quarters, while debt has increased every quarter?"
- "How does a company of this scale have zero payables?"
- "Why did the company suddenly re-enter the commercial tea business after exiting the business a year ago?"

217. Hunt also noted, "***I find it hard to believe*** that Le Nature's EBITDA margins are a full 10% higher than any other company in the space."

218. The Origination Division did not answer Hunt's questions. Rather, it obtained commitments from lenders for the full amount of the new credit facility. Only after those commitments were obtained, those very questions, and many more, were forwarded on to Podlucky at Le Nature's. Simply put, rather than answer the troubling questions raised by its own analyst, Wachovia purposefully brushed the questions aside.

***4) Wachovia's Trading Desk Sells Off All of Its Le Nature's Notes***

219. Following issuance of the Notes in June 2003, Wachovia maintained an inventory of the Notes both to "make a market" – that is, to provide liquidity for other parties interested in buying or selling the bonds – and for its own proprietary trading purposes. The market-making function was typical for banks underwriting such notes, and the broader market would expect Wachovia to fulfill that function. This was an important component of Wachovia's attempt to become a meaningful dealer in the high-yield bond market.

220. On information and belief, at some point in 2006, well before completion of the final Le Nature's credit facility and before the Company's public collapse, Wachovia's trading desk stopped committing *any* capital to investments in Le Nature's. Moreover, the trading desk sold off all of its holdings in Le Nature's Notes, including the market-making inventory and the Notes held for proprietary purposes. The trading desk chose to forego the market-making role notwithstanding market expectations of purchasers in private placements like the Note Offering.

221. Wachovia's trading desk position was flatly inconsistent with the research reports being published and distributed by Wachovia (assigning ratings such as "outperform" to Le Nature's). While Wachovia was publicly distributing materials touting Le Nature's' financial performance, including the Company's sales and profit growth, the actions of Wachovia's trading desk belied any true belief at Wachovia that Le Nature's was performing well.

**<u>Wachovia Publishes a Series of Misleading, Knowingly False Research Reports Touting Le Nature's as a Sound Investment</u>**

222. Throughout the years between issuance of the Notes and Le Nature's' collapse into bankruptcy, Wachovia repeatedly published and disseminated research reports that described Le Nature's as a thriving, successful company and a sound investment. Wachovia knew that the Noteholders, among others, were relying on these published reports. Wachovia was the underwriter for the Notes and the principal investment firm following Le Nature's – as a result, it was well aware that it had specialized knowledge regarding the Company and thus that market participants looked to Wachovia as an important source of information.

223. Wachovia also knew, as indicated just above, that the Company was disintegrating. Wachovia knew that Le Nature's was unable to meet its financial obligations, including obligations to Wachovia's own affiliate bank. Wachovia knew that potential purchasers of the Company, as well as Wachovia itself, had identified serious financial infirmities at the Company. And Wachovia knew that, whatever it was reporting to the investment community, it was dumping its own holdings of Le Nature's Notes because it had no faith in the company as a sound investment or even as a going concern.

224. Despite its knowledge of the Company's true financial condition, Wachovia's research reports were riddled with materially inaccurate statements in support of Wachovia's published conclusions that Le Nature's was a strong company and a desirable investment.

***1) August 18, 2003 – "Initiation of Coverage with a Buy"***

225. Less than two months after the Note Offering, Wachovia initiated a campaign to spur investment in the Notes in the secondary market. On August 18, 2003, Wachovia published a "High Yield Research" report authored by Bryan Hunt titled "Initiation of Coverage With a Buy" (the "August 2003 Report"). "Wachovia Securities" appeared prominently throughout the document, which was exclusively devoted to discussion of Le Nature's' financial performance and the Notes.

226. In the August 2003 Report, Wachovia stated, "We like Le*Nature's 9% senior subordinated notes for the following reasons," which included, *inter alia*, that "Le*Nature's has

significant free cash flow generating potential," and "[o]ver the intermediate term, we believe Le*Nature's could complete an initial public offering (IPO) or sell to a larger diversified beverage company." In comparing Le Nature's to, among others, Coca-Cola Enterprises Inc., Pepsi Bottling Group, Inc., and Coca-Cola Bottling Co., the report claimed that "Le*Nature's has the highest EBIT and EBITDA margins in the industry."

227. The August 2003 Report included numerous material misrepresentations regarding Le Nature's' financial performance and status, including the following:

- For the twelve-month period leading up to April 30, 2003, "Le*Nature's generated net sales and EBITDA of $151.6 million and $58.2 million, respectively, representing an EBITDA margin of 38.4%."
- "From 1998 to 2002, net sales and EBITDA increased at a CAGR of 63.1% and 64.8%, respectively."
- "Since 1999, Le*Nature's has increased its sales at a 68% CAGR to $152 million for LTM April 30. The company has achieved this improvement due to industry growth, the company's differentiated product and low-cost vertically integrated operations."
- "Le*Nature's generates sales per employee of $1.81 million, more than double its closest competitor."
- Based on multiples of EBITDA, Le Nature's' value ranged from $268 million to $541 million.

228. Given Le Nature's' actual 2002 net sales of $4.4 million, all of the information set forth above was materially incorrect and misleading when reported by Wachovia.

***2) October 3, 2003 – "Maintaining Buy Rating"***

229. On October 3, 2003, Wachovia published a "High Yield Bulletin" authored by Hunt with the title "Reports Better-than-Expected Q2 Results; Maintaining Buy Rating" (the "October 2003 Bulletin"). "Wachovia Securities" appeared prominently throughout the document, which focused exclusively on the Notes.

230. Once again, in light of the Company's actual financial performance in 2003, it is now clear that the October 2003 Bulletin included a series of material misrepresentations. Among other false statements, the October 2003 Bulletin indicated:

- "EBITDA for Q2 was $19.4 million, which compared favorabl[y] with adjusted EBITDA of $16.5 million in the year-earlier period and our estimate of $18.2 million."

- "Sales increased 46.4% to $59.4 million compared with $40.5 million in the year-earlier period."
- "Gross profit improved 19.5% to $21.8 million from the year-earlier period."
- The significant sales of tealeaf product in the second quarter of 2003 was to prepare for the formation of a new subsidiary to sell "higher-margin tea concentrate and tea by-products."

231. Among other deficiencies, the results reported by Wachovia in the October 2003 Bulletin are completely inconsistent with the Company's actual net sales of $9.8 million in 2003.

*3) November 19, 2003 – "Bonds Are Attractive"*

232. On November 19, 2003, Wachovia released another High Yield Bulletin focusing exclusively on Le Nature's Notes ("November 2003 Bulletin"). As before, the November 2003 Bulletin was authored by Hunt and is on "Wachovia Securities" letterhead. The bulletin concludes with Wachovia's maintenance of its "buy rating."

233. In the November 2003 Bulletin, Wachovia made several material misstatements, including the following (a) "Q3 EBITDA was $17.8 million, which compared favorably with $11.7 million in the year-earlier period and was generally in line with our estimate"; (b) "Gross profit rose 9.9% to $19.6 million from a year earlier"; and (c) "On a dollar basis, sales growth was $38.1 million year to date, and accounts receivable growth was $25.9 million."

*4) February 20, 2004 – "Strong Growth Ahead; Maintaining Our Outperform Recommendation"*

234. On February 20, 2004, Wachovia issued a High Yield Bulletin authored by Hunt and devoted to Le Nature's Notes ("February 2004 Bulletin"). Written on "Wachovia Securities" letterhead, the February 2004 Bulletin continued to paint a rosy picture of Le Nature's. Wachovia maintained its "outperform" rating for Le Nature's, indicating its purported belief that the Notes remained a sound investment.

235. In the February 2004 Bulletin, Wachovia made a series of material misstatements, including: (a) the Company achieved sales of $28 million in the fourth quarter of 2003; (b) gross margin improved "to 46.5% from 33.7% for the quarter"; and (c) "Gross profit increased 19.3% to $19.6 million versus a year earlier."

*5) April 19, 2005 – "Maintaining Outperform Rating"*

236. On April 19, 2005, Wachovia issued a High Yield Research report authored by Hunt and printed on "Wachovia Securities" letterhead ("April 2005 Report"). Following the same course as earlier reports and bulletins, Wachovia continued to assign an "outperform" rating to Le Nature's, notwithstanding Wachovia's knowledge of the Company's financial and managerial difficulties throughout 2003 and 2004.

237. Like earlier reports and bulletins, the April 2005 Report contained a series of material misrepresentations that were wholly inconsistent with the Company's actual performance. Among other false statements, Wachovia stated in the report that:

- EBITDA in the fourth quarter of 2004 was $12.2 million, "which compared favorably with $5.3 million in the year-earlier period."
- "FY2004 EBITDA, before $8.4 million of expenses associated with a flood, was $84.7 million."
- "Sales increased 78.1% from the year-earlier period to $43.1 million due to stronger case volume, the return of commercial tea sales and reduced trade spending."
- "For FY2004, net sales increased 33.0% to $207.1 million. Sales growth, which was higher than we expected and above management's $205.0 million guidance, was impressive given the fact that trade spending declined to 9.5% of sales in FY2004 from 13.4% in FY2003."
- "Strong sales leverage and trade spending reductions fueled Q4 gross margin improvement to 47.5% from 38.1% a year earlier."

238. In maintaining its "outperform" rating for Le Nature's Notes, Wachovia was reporting 2004 net sales of over $200 million, when actual 2004 net sales were less than $13 million. Wachovia was overstating Le Nature's' sales by *more than 16 times.*

*6) June 15, 2005 – "Reiterate Outperform Rating"*

239. On June 15, 2005, Wachovia again issued a High Yield Research report authored by Hunt and printed on "Wachovia Securities" letterhead ("June 2005 Report"). Once again, Wachovia reiterated its "outperform" rating for Le Nature's. In touting the Company and the Notes yet again, Wachovia asserted that "our investment thesis remains intact."

240. Like the other reports issued by Wachovia, the June 2005 Report is riddled with material misstatements that have virtually no relation to Le Nature's' actual financial performance.

Among other false statements, Wachovia reported: (a) EBITDA for the first quarter of 2005 was $21.5 million, comparing favorably to $20.4 million in the year-earlier period; (b) gross sales increased 24.3% from the year-earlier period to $59.8 million (including $6 million of tea concentrate sales); and (c) net sales increased 21.9% to $54.2 million.

*7) August 30, 2005 – "Maintaining Outperform Rating"*

241. On August 30, 2005, in the same format as previous High Yield Research reports, Wachovia again reiterated its "outperform" rating for Le Nature's ("August 2005 Report"). Wachovia asserted in the August 2005 Report that second quarter 2005 results "far exceed[ed] our expectations." Among other false statements, all of which were inconsistent with Le Nature's' actual revenues in 2004, Wachovia reported:

> Q2 [2005] EBITDA was $49.1 million, which compared favorably to $26.3 million in the year-earlier period. EBITDA handily beat our estimate due to the significant increase in sales levels and the reduction of trade spending expenses. EBITDA margin increased 495 bps from the year earlier period to 50.3% due to greater sales levels and reduced expenses.

242. The report further and falsely asserted that Le Nature's' gross sales had increased 44.9% from the year earlier period to $94.6 million for the second quarter of 2005.

*8) April 13, 2006 – "Maintaining Outperform Rating"*

243. Following the completion of 2005, in which Le Nature's' actual net revenues totaled less than $30 million for the year, Wachovia continued to publish research reports indicating that Le Nature's' revenues were *far* higher. On April 13, 2006, for example, Wachovia published a High Yield Research report, in the typical format, maintaining its "outperform" rating for Le Nature's ("April 2006 Report"). In the April 2006 Report, Wachovia indicated revenues of $275.1 million and gross profit of $134.3 million for 2005.

244. In addition to grossly misstating the Company's annual sales, Wachovia made several other material misstatements in the April 2006 Report, including: (a) gross sales for the fourth quarter of 2005 increased 14.6% from the year earlier period to $54.1 million; (b) net sales for the quarter increased 8.2% to $46.6 million; and (c) the Company "has generated case volume sales growth of 57%-90% annually over the past five years."

Exhibit A
Page 69

*9)   June 6, 2006 – "Q1 Results Ahead of Our Estimates; Reiterate Outperform"*

245.   On June 6, 2006, just a few months before Le Nature's was forced into bankruptcy, Wachovia released another High Yield Research report, again on "Wachovia Securities" letterhead, reiterating its "outperform" rating for Le Nature's ("June 2006 Report"). Following on the heels of the minority preferred shareholders' initiation of the Delaware Action, the June 2006 Report was glowing in its review of Le Nature's' performance.

246.   Among other false information, Wachovia stated in the June 2006 Report that, for the first quarter of 2006, EBITDA increased $18.4 million to $39.9 million (surpassing Wachovia's estimate of $25.0 million), and bottled case volume increased 80.3%. The June 2006 Report also falsely reported that the Company generated case volume sales growth of 57 to 90% annually over the last five years.

247.   In the June 2006 Report, Wachovia opined that, "[i]n 2006, we forecast Le-Nature could grow sales by 45.6% or $125.3 million to $400.4 million." Given Wachovia's extensive knowledge of Le Nature's' struggling finances by the time the June 2006 Report was issued, Wachovia's prediction – like many of its predictions in earlier bulletins and research reports – was false at the time it was made. Wachovia made similar inflated and false predictions of Le Nature's' expected performance in earlier reports, including the August 2003 Report, the November 2003 Bulletin, the February 2004 Bulletin, the June 2005 Report, and the April 2006 Report.

**Fully Aware of the Fraud, Wachovia Completes Yet Another Credit Facility for Le Nature's, Thereby Earning Even More Fees and Reducing Its Own Exposure**

248.   By August 2006, Wachovia was deeply troubled by Le Nature's' financial problems and growing disputes between management and the minority preferred shareholders. Wachovia's efforts to sell the Company had proven unsuccessful with bidders walking away, and the Company needed a cash infusion to meet its obligations and continue as a going concern. Wachovia was desperate to obtain a short-term cash infusion to keep the Company afloat, so that Wachovia and the Company could continue their marketing efforts, Wachovia could reduce its credit exposure to the Company, and Wachovia could generate additional significant fees.

249. Wachovia, together with Le Nature's, devised a plan to achieve their joint goals – they would create yet another credit facility to replace the December 2005 facility. The new facility could be funded by the pre-existing lenders to which Wachovia had made complete presentations in December 2005.

250. At the very end of August 2006, Wachovia informed the pre-existing lenders that a technical event of default had occurred under the existing Le Nature's credit facility, requiring that a new loan be substituted in its place. Wachovia told the lenders that the new facility had to be funded by September 1, only a few days (and, in many cases, one day) after Wachovia informed the lenders of the proposal.

251. Wachovia pitched the new facility to the lenders by explaining that they would get an enhanced yield – i.e., the interest rate was being increased – even though Le Nature's remained the same strong, growing company that it was in December 2005. Le Nature's still had a positive credit rating and was reporting increasing revenues and climbing EBITDA. As one Wachovia salesman explained in an e-mail of August 30, 2006, participating in the new facility was a "no brainer."

252. By providing false information to the existing Le Nature's lenders in the period leading up to the closing of the September 2006 credit facility, Wachovia was able to perpetuate the Company's existence for a few months longer. In completing the new facility, Wachovia failed to provide honest or accurate financial data to the lenders. Rather, it purported that the misleading and materially incorrect information included in its periodic research reports was correct, thereby hiding Le Nature's' true financial condition not only from the lenders on the new facility, but from the Noteholders and the bond market, as well.

253. On September 1, 2006, a Wachovia vice president e-mailed his colleagues that the Le Nature's credit facility was funded. He added, "At the end of the day, we reduce our exposure from $19MM drawn against our $25MM commitment to $0 drawn against what we expect to be a final commitment of under $10mm (target of $7MM, which is inside of our skim of $7.125MM)." In simple English, Wachovia had (i) reduced its affiliate's existing exposure by $19 million, all the

way down to zero; (ii) reduced its affiliate's potential exposure from $25 million to approximately $7 million; and (iii) earned a massive fee of $7.125 million for its few days of work.

254. Wachovia had plans to further market Le Nature's, and generate even more fees, even after the completion of the September 2006 credit facility – plans that were disrupted when Le Nature's was forced into bankruptcy. Merely a week before Le Nature's entered bankruptcy, Wachovia was contemplating a new $340 million bridge financing to buy out the minority preferred shareholders, as part of a recapitalization involving a new *$500 million* credit facility and $340 million in notes. Once again, Wachovia anticipated a huge fee for its assistance to Le Nature's.

**BDO's Audits Further Assist Le Nature's' Fraudulent Fund Raising Efforts**

255. In early 2004, when Le Nature's terminated E&Y as its auditor, the Company turned to BDO to fill the role of outside, "independent" auditor. From the very outset of its audit work for Le Nature's, BDO was well aware of the significant financial reporting and integrity issues at the Company. In connection with its first audit of Le Nature's' financial statements (for the year ending December 31, 2003), for example, BDO was provided with and reviewed K&L's Report. BDO saw firsthand, accordingly, evidence of inappropriate conduct at Le Nature's with respect to a variety of transactions (including bulk tea sales and barter transactions) and financial reporting before it even began its audit work.

256. Moreover, on information and belief, BDO was aware of the reasons for, and the circumstances surrounding, the removal and replacement of E&Y as the Company's auditor. In particular, BDO knew that E&Y was terminated after it requested – and because it requested – that the Company provide additional information. Indeed, to comply with GAAS, BDO was required to communicate with E&Y prior to accepting the Le Nature's engagement. (AU § 315) BDO was required to be mindful that "the predecessor auditor and the client may have disagreed about accounting principles, auditing procedures, or similarly significant matters." BDO was required to "make specific and reasonable inquiries" of E&Y, including inquiries regarding:

- "Information that might bear on the integrity of management;"

- "Disagreements with management as to accounting principles, auditing procedures, or other similarly significant matters;"
- Communications regarding "fraud, illegal acts by clients, and internal-control-related matters;" and
- E&Y's "understanding as to the reasons for the change of auditors."

(AU § 315.09) Had BDO made these inquiries, as it was required to do, it would have known about serious issues with management's integrity and the Company's reporting of financial results, including problems with the reporting of bulk tea and associated barter transactions.

257. On information and belief, Wachovia was also aware of the dispute between Le Nature's and E&Y and advised of the basis for the substitution of auditors. In contrast, neither the reasons for nor the circumstances surrounding the replacement of E&Y and the hiring of BDO Seidman were ever disclosed to the Noteholders or the bond market.

***1) BDO Failed to Disclose Material Shortcomings in Its 2003 Audit Report***

258. In March 2004, Le Nature's engaged BDO to audit the Company's year-end 2003 financial statements. BDO purported to conduct the audit in accordance with "auditing standards generally accepted in the United States of America [i.e., GAAS]."

259. From the outset, BDO acknowledged that – based on the fraud allegations asserted by the former Le Nature's employees – its audit of Le Nature's would be classified as "sensitive." As a result, BDO was required to undertake appropriate procedures to identify fraud and other possible sources of material misstatements in the Company's financial statements.

260. Indeed, as part of its audit, BDO reviewed the K&L Report, its recommendations, and Le Nature's' failure to implement the recommended steps. On information and belief, BDO noted Le Nature's' failure to adopt even the limited procedures recommended in the Report.

261. Additionally, like E&Y, BDO could see from the Report – which was never provided to the Noteholders – that Le Nature's had engaged in fraudulent conduct with respect to its bulk tea transactions. Upon reading the Report, and in reviewing the Report as part of its audit, BDO understood that the Company lacked reliable evidence for its tealeaf inventories, the bulk tea purchases and sales, and the purportedly related barter transaction for bottles. BDO knew that witnesses who were interviewed about the bulk tea transactions were not "forthcoming" and that

documents reflecting the transactions were "illegible, unreliable, or non-existent." BDO also knew that Podlucky exercised unilateral, unchecked control over the transactions.

262. Notwithstanding Le Nature's' obvious failures to comply with the Report's recommendations, and the obviously inappropriate reporting of bulk tea transactions referenced in the Report, BDO issued an unqualified report (a "clean audit opinion") on Le Nature's' financial statements:

> In our opinion, the 2003 financial statements referred to above present fairly, in all material respects, the financial position of Le-Nature's, Inc. at December 31, 2003, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America [i.e., "GAAP"].

***2) BDO Knew and Intended that Its Audit Reports Would Be Provided to, and Relied Upon by, the Noteholders***

263. BDO conveyed each set of Le Nature's' financial statements, together with its clean audit opinions, to the Company (and, upon information and belief, to Manufacturers and Traders Trust Co., as indenture trustee for the Notes) with the knowledge and intent that the audited financial statements would be provided directly to existing and potential Noteholders. Indeed, the documents governing issuance of the Notes *required* that audited annual financial statements be provided to the indenture trustee.

264. As BDO knew, Le Nature's never registered the Notes with the Securities and Exchange Commission ("SEC") and thus Le Nature's never became subject to the SEC's reporting requirements. As set forth in the Offering Memorandum, accordingly, Le Nature's' independent auditors were therefore required to provide annual audited financial statements to the indenture trustee:

> [A]t any time when we are not subject to the periodic reporting requirements of the Exchange Act, we will provide the Trustee with copies of annual audited financial statements prepared in accordance with U.S. generally accepted accounting principles and certified by our independent auditors and with unaudited interim financial statements prepared in accordance with U.S. generally accepted accounting principles for each of the first three quarters of each fiscal year. We will furnish the Trustee, upon its request, with sufficient copies of all such information to accommodate the

> requests of noteholders and holders of beneficial interests in the Notes.

265. Additionally, the trust indenture for the Notes provided that Le Nature's' independent auditor would support the Company's annual Officers' Certificate to the indenture trustee with confirmation that there was no Event of Default under the indenture. Section 3.5(b) of the indenture stated, in pertinent part:

> [T]he annual Officers' Certificate delivered pursuant to this Section 3.5 to the Trustee shall be accompanied by a written report of the Company's independent accountants (who shall be a firm of established national reputation) that in conducting their audit of the financial statements of the Company for the most recent fiscal year nothing has come to their attention that would lead them to believe that a Default or Event of Default under this Indenture has occurred insofar as they relate to accounting matters or, if any such violation has occurred, specifying the nature and period of existence thereof.

266. BDO knew not only that its audit opinions would be provided to the Noteholders, but that the Noteholders and potential Noteholders would directly and expressly rely on the content of those reports in determining to purchase, and maintain their holdings of, Notes issued by the Company.

### *3) BDO Issued Defective and False Audit Reports for the Years 2003, 2004, and 2005*

267. Each of BDO's audit reports plainly states that the audit at issue was performed in accordance with GAAS, and sets forth a basic description of GAAS requirements. Specifically, each report states:

> We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

268. To conduct its audit in accordance with GAAS, BDO was required to adhere to, among other applicable auditing standards, those set forth above in the section addressing E&Y's audit obligations (i.e., "The Requirements of GAAS"). Additionally, for audits of financial

statements for periods beginning on or after December 15, 2002, the AICPA's Auditing Standards Board released Statement on Auditing Standards ("SAS") 99, titled "Consideration of Fraud in a Financial Statement Audit." Because BDO's audits concerned fiscal years 2003, 2004, and 2005, each audit was subject to the newly adopted SAS 99.

269. The requirements for assessing fraud are especially important for a company such as Le Nature's, where the auditors acknowledged that management had overridden controls. For example, BDO's "GRA Summary Report" for the 2004 audit stated:

> **! Overriding of controls**
> Greg Podlucky, CEO, has overridden controls in place. This is documented in the special committee report. . . .

In its SAS 99 Memo for the same audit, BDO noted, "The CEO has overridden controls in the past and has control over the Company's operations."

270. BDO's recognition that Podlucky overrode controls necessitated additional testing. SAS 99 specifically cautions that "management is in a unique position to perpetrate fraud because of its ability to directly or indirectly manipulate accounting records and prepare fraudulent financial statements by overriding established controls that otherwise appear to be operating effectively." (AU § 316.57) Accordingly, GAAS provides a series of procedures to be performed "to further address the risk of management override of controls." (AU § 316.58-67) Having acknowledged that management override of controls was more than a risk – indeed, it had already materialized – BDO should have implemented additional testing to discern continued problems and ensure that management override of controls had not led to material reporting issues.

271. Inquiries of management alone are insufficient, under such circumstances, to assess fraud risk. "Making inquiries of others within the entity, in addition to management, may be useful in providing the auditor with a perspective that is different from that of individuals involved in the financial reporting process. The responses to these other inquiries . . . might provide information regarding the possibility of management override of controls." (AU § 316.26) Moreover, when "evaluating management's responses to the inquiries," auditors should be aware "that management is often in the best position to perpetrate fraud." (AU § 316.27)

272. The applicable standards make clear an auditor's duty, in the exercise of professional skepticism, to question financial data provided by the company it is auditing, to take steps to verify that data with independent sources outside of the company, and to question the reliability of information received from management where management itself may be involved in misconduct. BDO failed to follow even these basic standards in conducting its audits for each of the years 2003, 2004, and 2005.

**a) Failure to Test Sales**

273. For purposes of obtaining information needed to identify the risk of fraud, including the risk that a company's sales and revenues may be overstated, GAAS requires the auditor to perform the following analytical procedures:

> In planning the audit, the auditor also should perform analytical procedures relating to revenue with the objective of identifying unusual or unexpected relationships involving revenue accounts that may indicate a material misstatement due to fraudulent financial reporting. An example of such an analytical procedure that addresses this objective is a comparison of sales volume, as determined from recorded revenue amounts, with production capacity. An excess of sales volume over production capacity may be indicative of recording fictitious sales. (AU § 316.29)

274. On information and belief, BDO did not perform the required analytical procedures needed to identify the risk of material misstatement of Le Nature's' revenues. SAS 99 requires the auditor to presume that improper revenue recognition is a fraud risk. (AU § 316.41) Based on this presumption, the auditor is expected to plan and perform the audit to address this specific risk of fraud. Not only did BDO fail to perform the required analytical procedures designed to identify unusual or unexpected relationships involving revenue accounts, it failed to perform any direct substantive audit tests of Le Nature's' excessively inflated sales figures in 2003, 2004, and 2005, and falsely certified those sales amounts in each of the annual financial statements that it audited.

**b) Failure to Assess Fraud Risk with Non-Executive Employees**

275. When the management of a company may itself engage in fraud, and when management is known to be in a position to override controls (to the extent there are any controls in place), GAAS requires auditors to interview non-management employees regarding the possible existence of fraud. (AU §§ 316.26, 316.27)

276. Indeed, with respect to Le Nature's, had BDO interviewed several non-management employees – as the custodian did immediately after it was installed at the Company – BDO would have learned specific information regarding the Company's (and Podlucky's) inappropriate conduct. Notwithstanding its knowledge of Podlucky's management style and his disregard for controls, however, BDO chose not to interview non-management employees.

277. In connection with the 2004 audit, BDO met with four people at Le Nature's to discuss the likelihood of fraud: Podlucky (CEO), Jonathan Podlucky (COO), Lynn (executive vice president), and Getzik (CFO). BDO did not make inquiries to *even one* non-management employee. In selecting this group, BDO failed to heed the applicable audit standards, as well as its own recognition of Le Nature's' structure and lack of effective controls.

278. For the 2005 audit, BDO again spoke with a handful of individuals: Podlucky, Getzik, Lynn, and Mae Constantine of accounts payable. Outside of the Company's three top-ranking managers, BDO did not speak with anyone familiar with production, shipping, sales, accounts receivable, or a range of other issues clearly relevant to the audit.

**c) Gross Misclassification of Leases, Thereby Vastly Reducing the Stated Amount of Liabilities**

279. In 2005, Le Nature's substantially increased the amount of property and equipment that it was leasing, largely in connection with its new Phoenix facility. According to the 2005 audited financials, Le Nature's' *operating* lease obligations jumped from $37.8 million at the end of 2004 to over $413 million at the end of 2005. Over the same period of time, Le Nature's' *capital* lease obligations, as reported on the audited financials, fell from $7.4 million to $5.0 million.

280. The distinction between capital leases and operating leases is important. In essence, the lessee in a capital lease – much like an owner of property – assumes the risk that the value of the asset will change over time. Thus, capital lease payments are akin to repayment of debt to acquire property. Capital lease obligations must be disclosed as liabilities on a company's balance sheets. In contrast, operating lease expenses are typical expenses incurred during the course of a year that do not impact a company's balance sheet.

281. In performing its audit for the year ended December 31, 2005, BDO recognized the importance of the capital versus operating lease classification. Indeed, BDO understood and expressly acknowledged that Le Nature's was motivated to improperly classify capital leases as operating leases in order to avoid any balance sheet impact. In setting forth fraud risk factors in connection with the audit, BDO stated:

> ➢ Leases – risk of the company not correctly accounting for their lease obligations and identifying capital leases as operating leases. *The risk would be the company improperly records leases as operating so the debt does not get recorded and affect their compliance with financial covenants.*

282. In identifying factors that purportedly mitigated the recognized risk, BDO stated that "the Company structures a majority of their leases as operating (synthetic) leases to keep the debt off the books and not affect financial covenants." Contrary to BDO's suggestion, the Company's attempt to structure operating leases did not play any role in mitigating the risk that such leases would be improperly classified. Indeed, given BDO's recognition that the Company *wanted* its leases to be categorized as operating leases – in order to keep them off the Company's balance sheet – BDO was acutely aware that Le Nature's was motivated to *misstate* the character of the leases. BDO also committed to review new leases entered into in 2005 and determine if they were properly recorded.

283. BDO's review of Le Nature's' leases – to the extent any such review was actually conducted – was necessarily flawed because its ultimate approval of the Company's classification of hundreds of millions of dollars of leases as operating leases was incorrect. Statement of Financial Accounting Standards No. 13 ("FAS 13"), titled "Accounting for Leases," provides that "a lease shall be classified as a capital lease by the lessee" if the present value of the minimum lease payments equals or exceeds 90% of the fair value of the leased property (in excess of any related investment tax credit). Applying this test (which constitutes the GAAP standard for reporting by lessees like Le Nature's), the vast majority of the nearly $400 million in new leases entered into by Le Nature's in 2005 were, in fact, capital leases. Specifically, with respect to at least $200 million of the new leases, the lease payments were structured to amount to 90% (and, in many cases, far more) of the fair value of the property.

284. Having specifically identified this as a significant audit issue, and as a potential motivation to commit fraud, BDO was required to take steps to make a proper determination. In determining that the leases were properly classified as *operating* leases, BDO either knowingly bowed to Le Nature's' misclassification of the leases or refused to make a proper determination on its own, thereby willfully blinding itself to the economic substance of the leases in question.

285. Indeed, *even Wachovia was aware of the lease misclassification issue*, so much so that it retained the independent services of another major auditing firm to review the very same leases. In the fall of 2006, Wachovia retained the services of PricewaterhouseCoopers LLP ("PwC") to assist Wachovia in its own evaluation of Le Nature's. Among other things, Wachovia specifically instructed PwC to:

> Perform and prepare an analysis of debt and debt-like items, as well as identify other significant commitments and contingencies including developing an understanding of the nature of the expense and related commitments behind the operating lease agreements and deposits.

As part of its analysis, PwC reviewed, among other documents, BDO's audit workpapers in connection with the 2005 audit. PwC also held conversations with the BDO audit team.

286. Le Nature's' and BDO's misclassification of capital leases as operating leases was not limited to the leases for equipment to be installed in the Phoenix facility. Le Nature's also entered into a $65 million lease for the real estate – the plant and property – in Phoenix. As with the equipment leases, Le Nature's, with BDO's approval, classified the real estate lease as an operating lease, thereby keeping yet another $65 million liability off of the balance sheet. Once again, however, the lease should have been classified as a capital lease, and the full amount of the lease should have been reflected as a liability on Le Nature's' balance sheet.

287. Additionally, the property lease required Le Nature's to pay for the cost of electrical wiring and heating and air conditioning systems in the Phoenix facility. GAAP, specifically EITF 97-10, prohibits a lessee from paying for structural costs, and expressly identifies electrical wiring and air conditioning.

Exhibit A
Page 80

288. In total, between the equipment leases and the real estate lease, Le Nature's hid more than $200 million in liabilities from its balance sheet, all with BDO's knowledge and approval.

289. BDO's errors in validating the misclassification of more than $200 million in liabilities were patent; indeed, the only explanation is that BDO was complicit in Le Nature's' efforts to misstate its liabilities, thereby enabling the Company to take on additional and excessive loans. By permitting Le Nature's to hide a massive amount of debt, BDO approved fundamentally false – let alone materially misstated – financial statements.

290. Moreover, by enabling Le Nature's to borrow ever increasing amounts, the improper classification and off-balance sheet treatment of capital leases enabled Le Nature's to bring in more cash that could be used to fraudulently pay purported invoices to customers creating the appearance that the customers themselves had made those payments, thereby perpetuating the Company's revenues fraud.

**d) Failure to Expense Rental Payments**

291. BDO failed to comply with GAAP not only by classifying Le Nature's' equipment and property leases as operating leases, but also in failing to reflect substantial payments under those leases as expenses chargeable against Le Nature's' income. As a result, the 2005 audited financial statements that BDO confirmed substantially overstated Le Nature's' net income.

292. Specifically, Le Nature's planned to install four production lines at the Phoenix facility. The equipment for each line was financed through the leases referenced above (which Le Nature's and BDO improperly treated as operating leases). Accounting standards make clear that, when the equipment subject to such a lease comes under the control of the lessee (i.e., Le Nature's), and the lease has been classified as an operating lease, rental payments under the lease must be accounted for as expenses. Such expenses, in turn, are included in the company's statement of income, and therefore reduce the bottom-line net income reflected in the financial statements.

293. In its December 2005 presentation to potential lenders, Wachovia reported that the Company had "a total of 7 lines in operation." Because four of those lines were in Latrobe, three

of the production lines at the Phoenix plant must have been operational by the end of 2005. Accordingly, rental payments for three of the Phoenix lines should have been recorded as an expense in 2005.

294. Rent payments for the Phoenix equipment lines totaled approximately $12 million in 2005. Of this, BDO failed properly to expense rent payments for the second and third production lines. Those payments amounted to $8.6 million in 2005, or more than 37% of Le Nature's' reported $22.9 million net income. Applying the operating lease treatment that Le Nature's and BDO themselves adopted, the full $8.6 million should have been expensed. Even if Le Nature's had properly classified the leases as capital leases – which it failed to do – its income would have been reduced by a similar amount. Had proper capital lease treatment been used, income would have been reduced by depreciation of the assets subject to the leases and by interest expenses under the leases. Yet no such expenses were recorded on Le Nature's' financial statements, and no such depreciation was taken.

**<u>The Noteholders Sell Their Notes at Massive Losses</u>**

295. On November 1, 2006, a group of Le Nature's' trade creditors forced the Company into involuntary bankruptcy. As the court-appointed custodian of Le Nature's had already determined by that time, Le Nature's was a company in shambles. Not only was Le Nature's incapable of continuing as a going concern – thus leading to the cessation of its operations – but the sum total of its assets was not enough to cover anything close to the liabilities that the Company had incurred with the assistance of Defendants.

296. Upon the initiation of the bankruptcy and the revelation of the multi-year fraud, the value of Plaintiffs' Notes tumbled. Immediately after the bankruptcy filing, the Notes fell to a trading price in the range of $10 to $14. Plaintiffs in this action purchased their Notes at or above par value – that is, they paid full price ($100 or more) for the bonds. Subsequent to the revelation of the fraud, they sold their Notes for only a fraction of that price.

297. Plaintiffs purchased their Notes in reliance upon the false and misleading statements made by Le Nature's and the Defendants in this action. Had it not been for Defendants' misrepresentations and material support for Le Nature's' fraud, Plaintiffs would not

have purchased the Notes, would not have retained their holdings of the Notes, and would have avoided the massive losses they have suffered as the result.

**FIRST CAUSE OF ACTION**

**(Against Wachovia for Fraud)**

298. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

299. As set forth more fully above, Wachovia knowingly or recklessly made numerous false and misleading statements of material fact and omitted to state material facts regarding Le Nature's' finances and operations.

300. Wachovia materially misrepresented, among other things, the amount of Le Nature's' revenues, profits, liabilities, sales volume, and annual growth rates. Wachovia made these misrepresentations in, among other places and documents, offering memoranda, research, reports, and written and oral presentations to Plaintiffs as alleged in detail above.

301. Specifically, as set forth in detail above, including but not limited to the allegations in paragraph 128, the Offering Memorandum prepared by Wachovia contained, among many others, the following material false statements:

- Grossly exaggerated annual sales amounts for the years leading up to 2003 and the first several months of 2003;
- Grossly overstated annual growth rates in net and gross sales;
- Grossly inflated EBITDA margins;
- Grossly overstated sales amounts for bulk tea concentrate and packaged bulk tealeaves; and
- Grossly overstated deposits with purported suppliers.

302. As set forth in detail above, including but not limited to the allegations in paragraphs 222 through 247, Wachovia also made affirmative and material misrepresentations to Plaintiffs in its various research reports and bulletins. In those reports, Wachovia repeatedly overstated Le Nature's' revenues, profits, and growth. Wachovia falsely depicted Le Nature's as a successful company worthy of additional investment by consistently assigning very positive "buy" and "outperform" ratings to the Company. The numbers included in Wachovia's various reports,

as well as the investment ratings selected by Wachovia, painted an utterly false and misleading picture of Le Nature's.

303. Of particular importance, Wachovia grossly misrepresented to Plaintiffs Le Nature's' net sales for 2002 as $135.6 million, when they were actually only $4.4 million; net sales for 2003 as $155.7 million, when they were actually only $9.8 million; net sales for 2004 as $207.1 million, when they were actually only $12.8 million; and net sales for 2005 as $275.1 million when they were actually only $28.3 million. Wachovia made additional false representations to Plaintiffs, as detailed above, concerning Le Nature's' profits, sales volume, and growth rates for each of the fiscal years 2001 through and including 2005.

304. Wachovia also failed to disclose material information known only to Wachovia, and specifically not known to Plaintiffs, which under the circumstances, Wachovia was under a duty to disclose. Wachovia failed to disclose, among other things, (i) Wachovia's identification of serious issues involving Le Nature's' organizational structure, sales, and financial reporting, (ii) Wachovia Bank's fronting of interest payments under certain credit facilities to hide Le Nature's' inability to make the payments, (iii) the existence of a Special Committee convened after the resignation of Le Nature's' CFO and the results of the Committee's report, and (iv) the misclassification of massive amounts of leases to keep them off of Le Nature's' balance sheets.

305. Wachovia was required to disclose these facts to Plaintiffs because, *inter alia*, (i) the absence of such disclosure rendered prior statements – including statements in documents (such as research reports) that Wachovia sent directly to Plaintiffs and others – false and misleading or half-truths, (ii) Wachovia had special knowledge regarding Le Nature's that was not available to Plaintiffs, (iii) Wachovia had access to Le Nature's' management by virtue of its multi-year investment banking and advisory relationship with Le Nature's, and (iv) the Notes Offering was underwritten and arranged by Wachovia.

306. Wachovia knew, or was reckless in not knowing, that its conduct constituted a fraud on Plaintiffs and would result in, and did result in, the purchase and retention of the Notes by Plaintiffs and the subsequent loss of a substantial portion of the value of said Notes. Plaintiffs that purchased their notes before certain of Wachovia's false statements – such as

misrepresentations in the periodic research reports – would have sold their Notes upon issuance and receipt of those statements had Wachovia properly disclosed what it knew about the state of Le Nature's' finances. Indeed, Plaintiffs sold their Notes immediately after the fraud was publicly revealed.

307. Wachovia made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing Plaintiffs to purchase and retain the Notes in reliance thereon, and Plaintiffs did reasonably and justifiably rely on the misrepresentations and omissions in purchasing and retaining said Notes.

308. Each Plaintiff has been damaged by Wachovia's wrongful conduct, which caused each of them to purchase and retain the Notes.

309. Wachovia's fraudulent conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of Plaintiffs. Wachovia's conduct evinced a high degree of moral turpitude and demonstrated wanton dishonesty.

310. By reason of the foregoing, Plaintiffs are entitled to a judgment against Wachovia awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SECOND CAUSE OF ACTION

### (Against Wachovia for Aiding and Abetting Fraud)

311. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

312. As alleged in detail above, Le Nature's engaged in what is now a widely acknowledged fraud with respect to, among other things, the operation of its business and the reporting of its financial results. Le Nature's knowingly created and falsified financial reports as part of its effort to induce investors, including Plaintiffs, to invest in the Company, through the purchase of Notes and interests in the various Credit Facilities extended to Le Nature's.

313. Le Nature's' fraud included, but was not limited to, its massive overstatement of revenues for every year from at least 2001 through 2005. As alleged in detail above, Le Nature's also grossly overstated its profits, its sales volume, and its growth rate.

314. Le Nature's acted knowingly or recklessly in creating and disseminating its falsified financial results. Le Nature's' principal executives, including Podlucky, orchestrated the misstatements. Le Nature's prepared these false records, including its financial statements, for the very purpose of inducing investors to participate in Le Nature's' financing activities, including the Note Offering.

315. Le Nature's also concealed from Plaintiffs material information concerning the true nature of its business, assets, and operations, including, but not limited to, the determinations of the Special Committee that was convened after the resignation of the Company's key financial managers and the extent of the Company's liabilities that were kept off the books through the massive misclassifications of capital leases.

316. By the foregoing conduct and by its other conduct and omissions, Le Nature's willfully and intentionally misrepresented to and concealed from Plaintiffs the true financial condition, business, operations and assets of Le Nature's for the purpose of inducing Plaintiffs to purchase and retain the Notes.

317. As set forth in detail above, Wachovia was aware of, or consciously disregarded, the fact that Le Nature's was conducting a fraud on investors, including specifically the purchasers of the Notes. Wachovia knew, among other things, that (i) Le Nature's was basing its revenues on improper sales prices, (ii) Le Nature's' quarterly and annual financial reports were rife with material misstatements, (iii) Wachovia Bank was fronting interest payments to Credit Facility lenders on behalf of Le Nature's, (iv) Le Nature's had misclassified more than $200 million in capital leases, and (v) Le Nature's had convened a Special Committee that drafted a report highlighting operating deficiencies that the Company did not subsequently address. Wachovia also knew that publicly disclosing any of these facts would immediately have caused investors to lose confidence in Le Nature's, jeopardizing Wachovia's ability to generate fees and reduce its credit risk pursuant to future lending arrangements for Le Nature's.

318. Wachovia substantially assisted the fraud committed by Le Nature's by providing financing to Le Nature's, lending its name and credibility to Le Nature's, disseminating false information to induce Plaintiffs to purchase and retain the Notes, and withholding material and

damaging information from Plaintiffs. Wachovia's assistance included, among other things (i) directly disseminating materials regarding Le Nature's' financials to Plaintiffs, (ii) orchestrating and participating in telephone and in-person presentations regarding Le Nature's directly to Plaintiffs, (iii) compiling, drafting, and producing written presentation materials regarding Le Nature's' financials and distributing these materials to Plaintiffs, and (iv) actively marketing the Notes to Plaintiffs by telephone, e-mail and otherwise.

319. Absent Wachovia's active and knowing participation, Le Nature's' fraudulent scheme could not have been perpetrated. As a direct and proximate cause of Wachovia's actions, Plaintiffs suffered damages.

320. Wachovia's conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of Plaintiffs. Wachovia's conduct evinced a high degree of moral turpitude and demonstrated wanton dishonesty.

321. By reason of the foregoing, Plaintiffs are entitled to a judgment against Wachovia awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**THIRD CAUSE OF ACTION**

**(Against Wachovia for Negligent Misrepresentation)**

322. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

323. In connection with the decision by Plaintiffs to purchase and retain the Notes, Wachovia made numerous representations to Plaintiffs about Le Nature's depicting Le Nature's as a strong company, with a history of substantial revenues and profits growth. In the materials that it distributed and the presentations that it made, Wachovia misrepresented, among other things, the amount of Le Nature's' revenue, profits, and liabilities. In particular, as set forth in detail above, the Offering Memorandum and various research reports and bulletins published by Wachovia grossly misrepresented Le Nature's' financial condition.

324. Wachovia should have known, and negligently disregarded, the falsity of these material misrepresentations, concealing from Plaintiffs, among other things, that (i) Le Nature's'

financial reports contained numerous misstatements, (ii) Le Nature's was basing its revenues on improper wholesale prices, (iii) Wachovia's bank affiliate was fronting interest payments to Credit Facility lenders on behalf of Le Nature's, (iv) Le Nature's had misclassified more than $200 million in capital leases, and (v) Le Nature's had convened a Special Committee that drafted a report highlighting operating deficiencies that the Company did not subsequently address.

325. Wachovia negligently made these material misrepresentations and/or omissions which induced Plaintiffs to purchase and retain the Notes.

326. Plaintiffs had a special relationship of trust with Wachovia. Wachovia actively solicited Plaintiffs to purchase the Notes. Wachovia knew that Plaintiffs were dependent on it and relied on it to disclose material facts, such as those concerning Wachovia's negligent misrepresentations and omissions. Wachovia knew that Plaintiffs received most of their information about Le Nature's directly from Wachovia, including through presentations, memoranda, reports and other communications with Plaintiffs. Wachovia also knew that this information, including Wachovia's misrepresentations and omissions, was material, and that Plaintiffs were relying on such representations and omissions in choosing to purchase and retain the Notes.

327. Wachovia was in a position of unique and superior knowledge to Plaintiffs regarding information about the operations and financial condition of Le Nature's. As the long-time advisor and investment banker to Le Nature's, Wachovia had substantial access to Le Nature's' management and financial records. Plaintiffs did not have access to similar information.

328. When each of the Plaintiffs purchased the Notes, they did not know, and could not have learned, the true facts concerning the foregoing material misrepresentations and omissions. Plaintiffs did not learn, and could not have learned, the true facts concerning the foregoing material misrepresentations until the collapse of Le Nature's in 2006.

329. In purchasing and retaining the Notes, Plaintiffs reasonably relied upon and were induced to proceed by the foregoing negligent misrepresentations and/or omissions. Plaintiffs justifiably relied on Wachovia's representations regarding the financial health and strength of Le Nature's.

330. Each of the Plaintiffs has been damaged by Wachovia's misrepresentations and omissions, which caused each of them to purchase and retain the Notes.

331. By reason of the foregoing, Plaintiffs are entitled to a judgment against Wachovia awarding Plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## FOURTH CAUSE OF ACTION

**(Against Wachovia for Fraudulent Inducement)**

332. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

333. This claim is asserted by Plaintiffs that purchased their Notes directly from Wachovia. This group includes Plaintiffs that purchased Notes from Wachovia when they were first issued in June 2003, as well as Plaintiffs that subsequently purchased Notes from Wachovia.

334. As set forth in detail above, Wachovia knowingly misrepresented, concealed, and failed to disclose material facts regarding Le Nature's' finances and operations, which under the circumstances, Wachovia was required to disclose.

335. In connection with Plaintiffs' decisions to purchase the Notes, Wachovia materially misrepresented, among other things, the amount of Le Nature's' revenues, profits, liabilities, sales volume, and annual growth rates. As set forth in detail above, Wachovia misrepresented Le Nature's as a strong company, with a history of substantial revenues and profit growth. Wachovia made these material misrepresentations and omissions in, among other places and documents, offering memoranda, research reports, and written and oral presentations to Plaintiffs.

336. Wachovia made these misrepresentations and omissions for the purpose of inducing Plaintiffs to purchase Notes from Wachovia. Wachovia knew that Plaintiffs would rely upon these misrepresentations and omissions in determining whether to purchase the Notes.

337. Plaintiffs justifiably relied on Wachovia's misrepresentations and omissions in determining whether to purchase the Notes from Wachovia.

338. Absent Wachovia's misrepresentations and omissions, Plaintiffs that purchased Notes from Wachovia would not have done so. Each Plaintiff that purchased Notes from Wachovia has been damaged by Wachovia's conduct.

339. Because Plaintiffs would not have purchased Notes from Wachovia absent Wachovia's misrepresentations and omissions, these Plaintiffs should be awarded damages in the amount required to return them to the status quo ante, as if they had never purchased the Notes.

## FIFTH CAUSE OF ACTION

**(Against E&Y for Fraud)**

340. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

341. In 2002, Le Nature's engaged E&Y to perform an audit of its balance sheet and related financial statements for its fiscal year ending in 2002. E&Y also performed a reaudit of Le Nature's 2000 and 2001 financial statements, as requested by Le Nature's in advance of, and specifically to enable, the Note Offering.

342. E&Y understood that the purpose of its audit work was to provide audited financials in connection with the Note Offering. E&Y's audit report, together with the accompanying financial statements for 2000, 2001, and 2002, were appended directly to the Offering Memorandum for the Note Offering. Financial information from the audited financial statements was included throughout the Offering Memorandum that was provided to investors, including Plaintiffs.

343. E&Y knew that investors would rely on the financial statements and E&Y's audit report in evaluating Le Nature's and determining whether to purchase the Notes.

344. E&Y was aware that Le Nature's exhibited numerous high risk indicators for fraud, such as (i) owner involvement in day-to-day operations, (ii) domination of management by a single person without compensating controls, and (iii) reports of unusually rapid growth and profitability. E&Y acknowledged that Le Nature's' organization and reported growth presented atypical risks, mandating the use of enhanced audit procedures.

Exhibit A
Page 90

345. Given these risks and indications of fraud, E&Y was required by GAAS to take steps to determine whether fraud had occurred or was occurring at Le Nature's, including specific review procedures for the financial statements.

346. Rather than undertake the mandated steps, including compliance with the GAAS provisions set forth in detail above, E&Y failed to conduct complete and independent audits and instead issued and executed a clean audit report accompanying materially false financial statements. As a result, as set forth more fully above, E&Y knowingly or recklessly made false and misleading statements of material fact and omitted to state material facts regarding Le Nature's' finances and operations.

347. The financial statements certified by E&Y and accompanied by E&Y's audit report grossly overstated Le Nature's' revenues and profits. E&Y certified, for example, that Le Nature's generated net sales of $135.7 million in 2002, when net sales that year were actually no greater than $4.4 million. E&Y knowingly or recklessly certified these erroneous financial statements without completing necessary and appropriate verifications of sales levels and revenues.

348. The balance sheets included within the financial statements certified by E&Y and accompanied by E&Y's audit reports materially overstated Le Nature's' assets and understated Le Nature's' liabilities. The balance sheets grossly overstated, among other things, the Company's raw materials inventories, which purportedly consisted primarily of tealeaf inventory. Tealeaf inventory was overstated by more than 2800%.

349. E&Y also knowingly or recklessly failed to disclose Le Nature's' inadequate internal controls and the CEO's domination of the Company's finances in its audit report. E&Y was required to disclose such material facts because it had special knowledge regarding Le Nature's that was not available to the Noteholders. In its capacity as auditor and advisor to the Company, E&Y had access to Le Nature's' management and was privy to Le Nature's' financial information, controls, and internal accounting books, records, and methods.

350. Notwithstanding its awareness of material discrepancies in Le Nature's' financial records and the absence of adequate financial controls at the Company, E&Y falsely certified that

Le Nature's' financial statements for each of the fiscal years ended 2000, 2001, 2002 were in compliance with GAAP and that its audits of the financial statements complied with GAAS.

351. E&Y knew that investors would rely on its audits because it was retained to issue audits specifically in connection with Le Nature's' capital raising efforts. As alleged in detail above, although E&Y was initially retained to audit Le Nature's' fiscal year ending 2002, E&Y also performed a re-audit for fiscal years 2000 and 2001 immediately before Le Nature's issued the Offering Memorandum and Notes. E&Y's audit report for all three years – 2000, 2001, and 2002 – was appended directly to the Offering Memorandum.

352. E&Y knew, or was reckless in not knowing, that its conduct constituted a fraud on Plaintiffs and would result in, and did result in, Plaintiffs' purchase and retention of Notes and the subsequent loss of a substantial portion of the value of these Notes.

353. E&Y made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing Plaintiffs and other investors to purchase and retain the Notes in reliance thereon, and Plaintiffs did reasonably and justifiably rely on the misrepresentations and omissions in purchasing and retaining said Notes.

354. Each Plaintiff has been damaged by E&Y's wrongful conduct, which caused each of them to purchase and retain the Notes.

355. E&Y's fraudulent conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for Plaintiffs' rights and interests. E&Y's conduct evinced a high degree of moral turpitude and demonstrated wanton dishonesty.

356. By reason of the foregoing, Plaintiffs are entitled to a judgment against E&Y awarding the Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SIXTH CAUSE OF ACTION

**(Against E&Y for Fraud/Failure to Correct)**

357. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

358. E&Y understood that the purpose of its audit work was to provide audited financials in connection with the Note Offering. E&Y's audit report, together with the accompanying financial statements for 2000, 2001, and 2002, were appended directly to the Offering Memorandum for the Note Offering. E&Y knew that its audits of Le Nature's' financial statements were relied upon by Noteholders in their decision to purchase and retain the Notes.

359. As a result of its audits, when it issued its audit report, E&Y knew, or was reckless in not knowing, that Le Nature's fraudulently misrepresented its financial results.

360. E&Y sent a letter to Podlucky advising him, among other things, that E&Y would not stand behind any of its audits of Le Nature's' financial statements until the completion of an independent examiner's investigation and E&Y's own performance of additional auditing procedures. E&Y advised only Le Nature's' management that it was disassociating itself from its own previous audit report. Notwithstanding the very purpose of E&Y's audit report – i.e., to support and enable the Note Offering – E&Y never informed the Noteholders or the bond market that E&Y questioned the reliability of its previous audit report.

361. The Special Committee's investigation further cemented E&Y's knowledge that its audit report of Le Nature's' financials contained material misrepresentations. The K&L Report – read in light of the documents E&Y reviewed in its audits for the years 2000-2002 – made unmistakably clear that Le Nature's was engaged in fraud. E&Y knew upon reading the Report – even if it did not know before – that the bulk tea inventories indicated in the audited financial statements were false, the cost of goods sold in the audited financial statements were false, the gross sales set forth in the audited financial statements were false, and the net income figures indicated in the audited financial statements were false.

362. Upon reviewing the K&L Report, E&Y sent a letter to Podlucky indicating that, in light of the report, E&Y would have to perform additional auditing procedures before it could stand behind its previous audit reports. Specifically, E&Y told Podlucky that a "tea leaf inventory rollforward" was necessary, and that E&Y needed to have its representative prepare and mail confirmations of tealeaf transactions that could be used to reconcile the inventory rollforwards.

363. E&Y never received the information required for a new inventory rollforward or independent corroboration of the bulk tea transactions. Nor did E&Y take any further steps to test the reliability of its previous audit report. Rather, E&Y was terminated as Le Nature's' auditor.

364. Despite E&Y's knowledge that its audits of Le Nature's' 2000, 2001, and 2002 financials contained material misstatements when the report was issued, and despite E&Y's failure to perform the very tests that it indicated as necessary to reevaluate the previously issued financial statements, E&Y never took any steps to inform Plaintiffs that the financial statements were unreliable.

365. E&Y failed to correct the false and unsupported statements in its audit report even though it knew that the Noteholders relied on E&Y's false statements in deciding to purchase and retain the Notes. Indeed, quite apart from correcting the faulty audit report, E&Y permitted the successor auditor (BDO) to use the 2002 audited financial statements in undertaking its audit work.

366. E&Y made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing Plaintiffs to purchase and retain the Notes in reliance thereon, and Plaintiffs did reasonably and justifiably rely on the misrepresentations and omissions in purchasing and retaining said Notes.

367. Plaintiffs have been damaged by E&Y's wrongful conduct, which caused each of them to purchase and retain the Notes.

368. E&Y's fraudulent conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for Plaintiffs' rights and interests. E&Y's conduct evinced a high degree of moral turpitude and demonstrated wanton dishonesty.

369. By reason of the foregoing, Plaintiffs are entitled to a judgment against E&Y awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**SEVENTH CAUSE OF ACTION**

**(Against E&Y for Aiding and Abetting Fraud)**

370. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

371. As set forth in detail above, and as specifically reiterated in paragraphs 312 through 316, Le Nature's engaged in a massive fraud that included, among other things, the gross overstatement of revenues and profits in order to induce investors, including Plaintiffs, to purchase and retain Notes issued by Le Nature's.

372. E&Y was aware of, or consciously disregarded, the fact that Le Nature's was conducting a fraud on investors, including specifically the purchasers of Notes. E&Y knew, among other things, that (i) Le Nature's' chief executive completely dominated the Company and ignored and overrode the limited set of controls that were in place, (ii) Le Nature's' inventory valuations, accounts receivable, and statements of deposits on inventory held by its customers were all massively overstated, (iii) Le Nature's' accounts payable were significantly understated, (iv) Le Nature's had numerous unrecorded liabilities, and (v) Le Nature's failed to satisfy debt obligations on numerous occasions and could not keep current with its federal and state taxes. E&Y also knew that disclosing these facts, in the audit report it drafted or otherwise, would disrupt the Note Offering, thereby preventing the sale of the Notes and jeopardizing E&Y's relationship with Le Nature's' management.

373. E&Y substantially assisted the fraud committed by Le Nature's by certifying patently false financial statements and permitting those statements, with its signature and approval, along with E&Y's audits of those statements, to be attached to the Offering Memorandum distributed to the Noteholders. By issuing a clean audit report attesting to the fair presentation of Le Nature's' financial statements in conformity with GAAP, E&Y enabled Le Nature's to perpetrate its fraud. E&Y further assisted the fraud by failing to disclose to the Noteholders or others that E&Y itself had determined, following the resignation of Le Nature's' senior financial managers, that its audit report was unreliable.

374. Absent E&Y's active and knowing participation, Le Nature's' fraudulent scheme could not have been perpetrated. As a direct and proximate result of E&Y's actions, Plaintiffs suffered damages.

375. E&Y's conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for Plaintiffs' rights and interests. E&Y's conduct evinced a high degree of moral turpitude and demonstrated wanton dishonesty.

376. By reason of the foregoing, Plaintiffs are entitled to a judgment against E&Y awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## EIGHTH CAUSE OF ACTION

### (Against E&Y for Negligent Misrepresentation)

377. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

378. E&Y held and continues to hold itself out as a professional accounting firm qualified to perform public accounting services, including independent audits. E&Y has a duty to maintain, and should be held to, the generally accepted auditing and accounting standards by which an auditor is obligated to conduct an audit.

379. E&Y executed engagement letters with Le Nature's with respect to its audit of Le Nature's' financial statements for the year 2002 and its re-audit of Le Nature's' financial statements for the years 2000 and 2001. In these letters, E&Y stated that it would conduct its audits in accordance with GAAS, and that the objective was to express an opinion on Le Nature's' financial statements in conformity with GAAP. The letters were executed by E&Y's Pittsburgh, Pennsylvania office, whose personnel conducted the audits in Pennsylvania and issued the resulting audit report.

380. E&Y owed the duty to perform its audit work in accordance with GAAS not only to Le Nature's, but also to Le Nature's' investors. E&Y knew that its audit report was being provided directly to potential Note purchasers to induce the potential Note purchasers to purchase the Notes – indeed, the audit report was appended as an exhibit to the Offering Memorandum and

distributed to potential Note purchasers. Moreover, E&Y was retained just before the Note Offering to perform the re-audit of fiscal years 2000 and 2001 specifically to enable inclusion of a complete audit report in the offering materials.

381. Additionally, in the course of their work for Le Nature's, Wachovia and E&Y had extensive contacts with each other to discuss various issues relating to Le Nature's' financial condition and financial statements. As E&Y was aware, Wachovia arranged and underwrote the Note Offering, and thus E&Y was further linked to the Noteholders by providing and sharing information with Wachovia.

382. E&Y knew that its audit reports and the accompanying financial statements were being provided to investors, including Plaintiffs; knew that the investors, including Plaintiffs, would rely on those audit reports and the accompanying financial statements; and was further linked to Plaintiffs as the result of its provision of information to Wachovia.

383. Additionally, E&Y was in a position of unique and superior knowledge to the Noteholders regarding information about the operations and financial condition of Le Nature's. As the auditor and advisor to Le Nature's, E&Y had substantial access to Le Nature's' management and financial records. The Noteholders did not have access to similar information.

384. Notwithstanding its professional obligation to audit Le Nature's in accordance with GAAS, E&Y failed to do so. E&Y did not exercise the professional skepticism that is a central element of a proper GAAS audit. Instead, E&Y accepted, without adequate questioning or corroboration, information provided to it by Podlucky and other senior executives at Le Nature's. E&Y knew that these few individuals, more than anyone else, would be motivated to, and were in a position to, misrepresent Le Nature's' finances, sales, and profits. Nonetheless, E&Y failed adequately to question the information provided by these few executives, as is required of an auditor acting in accordance with GAAS.

385. E&Y's negligent conduct is demonstrated by the firm's many failings in connection with its audits of Le Nature's, including:

- Accepting the veracity of the financial information provided to it by Le Nature's management in the face of numerous indications of fraud;

- Failing to corroborate management explanations or representations concerning material matters;

- Failing to assess the risk of material misstatement of the financial statements due to fraud;

- Failing to take adequate steps to ensure that the financial statements were free of misstatements;

- Failing to obtain a level of knowledge of Le Nature's' business that would enable E&Y to perform its audit in accordance with GAAS;

- Failing to obtain sufficient knowledge to understand the events, transactions, and practices that had a significant effect on Le Nature's' financial statements; and

- Failing to employ enhanced audit procedures despite numerous indications that such enhanced monitoring was required in order to comply with GAAS.

386.    As a result of its negligent conduct of the audit, E&Y, contrary to its professional obligations, certified financial statements that were grossly incorrect, issued an improper clean audit report, and failed to advise the Noteholders of the massive fraud that was being committed at Le Nature's.

387.    When each of the Plaintiffs purchased the Notes, they did not know, and could not have learned, the true facts concerning the foregoing material misrepresentations and omissions. Plaintiffs did not learn, and could not have learned, the true facts concerning the foregoing material misrepresentations until the collapse of Le Nature's in 2006.

388.    In purchasing the Notes, Plaintiffs reasonably relied upon and were induced to proceed by the foregoing negligent misrepresentations and/or omissions.  Plaintiffs justifiably relied on E&Y's representations regarding the financial health and strength of Le Nature's and E&Y's certification of Le Nature's' financial statements as being in compliance with GAAP.

389.    Plaintiffs have been damaged by E&Y's negligent conduct, misrepresentations, and omissions, which caused each of them to purchase the Notes.

390.    By reason of the foregoing, Plaintiffs are entitled to a judgment against E&Y awarding compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## NINTH CAUSE OF ACTION

**(Against BDO for Fraud)**

391. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

392. Le Nature's engaged BDO to perform an audit of its balance sheet and related financial statements as of December 31, 2003. BDO was similarly engaged to perform audits for the years ended December 31, 2004 and December 31, 2005. As part of its audits, BDO was required to undertake extensive auditing and accounting work sufficient to comply with its GAAS duties and to ensure that the financial statements were presented in compliance with GAAP. BDO was also engaged by the Company to do additional work, including review of its unaudited quarterly financial reports.

393. As set forth above, BDO understood and acknowledged from the outset of its engagements that the Le Nature's audit was "sensitive." BDO was aware of the history leading to its engagement, including the resignation of Le Nature's' most senior financial managers and Le Nature's' termination of its relationship with E&Y. BDO also acknowledged specific and significant fraud risks at Le Nature's, including Podlucky's control over the Company's activities and his history of overriding controls. As such, BDO was required to undertake steps to determine whether fraud had occurred at Le Nature's, including specific review procedures for the financial statements and conducting interviews with non-management employees of Le Nature's.

394. Rather than undertake the mandated steps, including compliance with the GAAS provisions set forth in detail above, BDO failed to conduct complete and independent audits and instead issued and executed clean audit reports accompanying materially false and misleading statements. As a result, as set forth more fully above, BDO knowingly or recklessly made false and misleading statements of material fact and omitted to state material facts regarding Le Nature's' finances and operations.

395. The financial statements certified by BDO and accompanied by BDO's audit reports grossly overstated Le Nature's' revenues and profits. Specifically, BDO certified that Le Nature's generated net sales of $155.7 million in 2003, when net sales that year were only $9.8

million; that Le Nature's generated net sales of $207.1 million in 2004, when net sales that year were only $12.8 million; and that Le Nature's generated net sales of $275.1 million in 2005, when net sales that year were only $28.3 million. BDO knowingly or recklessly certified these erroneous financials rather than complete appropriate verifications of sales levels and revenues.

396. The balance sheets included within the financial statements certified by BDO and accompanied by BDO's audit reports also materially understated Le Nature's' liabilities. For the year ended December 31, 2005, in particular, the balance sheet failed to include more than $200 million in capital leases. BDO was responsible for determining, in conjunction with Le Nature's, the classification of these leases and knowingly or recklessly classified the lease obligations as operating leases so that they would not be included on the balance sheet.

397. In addition to overstating revenues, the income statement for the year ended December 31, 2005, which was also included within the financial statements certified by BDO and accompanied by BDO's audit report for that year, substantially understated Le Nature's' expenses due to the improper characterization of rental expenses under equipment leases for the Phoenix facility. As a result, net income was further exaggerated.

398. BDO also knowingly or recklessly failed to disclose the Company's inadequate internal controls and the CEO's domination of Le Nature's' finances in its audit reports. BDO was required to disclose such material facts because it had special knowledge regarding Le Nature's that was not available to investors, including Plaintiffs. In its capacity as auditor and advisor to Le Nature's, BDO had access to Le Nature's' management and was privy to Le Nature's' financial information, controls, and internal accounting books, records, and methods.

399. Notwithstanding its awareness of material discrepancies in Le Nature's' financial records and the absence of adequate internal financial controls at the Company, BDO falsely certified that Le Nature's' financial statements for each of the fiscal years ended December 31, 2003 through December 31, 2005 were in compliance with GAAP and that its audits of the financial statements complied with GAAS.

400. BDO knew, by virtue of express provisions in the Offering Memorandum and the trust indenture for the Notes that its audit reports and the accompanying financial statements, and

the unaudited quarterly financial statements that it reviewed, would be distributed to and relied upon by Plaintiffs.

401. BDO knew, or was reckless in not knowing, that its conduct constituted a fraud on Plaintiffs and would result in, and did result in, the purchase and retention of the Notes by Plaintiffs and the subsequent loss of a substantial portion of the value of those Notes. Plaintiffs that purchased their notes before the BDO audit reports were issued would have sold their Notes upon issuance and receipt of those reports had BDO properly disclosed what its audits revealed about Le Nature's' finances. Indeed, Plaintiffs sold their Notes immediately after the fraud was publicly revealed.

402. BDO made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing Plaintiffs to purchase and retain the Notes in reliance thereon, and Plaintiffs did reasonably and justifiably rely on BDO's misrepresentations and omissions in purchasing and retaining said Notes.

403. Each Plaintiff has been damaged by BDO's wrongful conduct, which caused each of them to purchase and retain the Notes.

404. BDO's fraudulent conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of Plaintiffs. BDO's conduct evinced a high degree of moral turpitude and demonstrated wanton dishonesty.

405. By reason of the foregoing, Plaintiffs are entitled to a judgment against BDO awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**<u>TENTH CAUSE OF ACTION</u>**

**(Against BDO for Aiding and Abetting Fraud)**

406. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

407. As set forth in detail above, and as specifically reiterated in paragraphs 312 through 316, Le Nature's engaged in a massive fraud that included, among other things, the gross

overstatement of revenues and profits in order to induce investors, including Plaintiffs to purchase the Notes.

408. BDO was aware or consciously disregarded the fact that Le Nature's was conducting a fraud on investors, including specifically the Noteholders. BDO knew, among other things, that (i) Le Nature's had misclassified more than $200 million of capital leases as operating leases, thereby keeping that amount off of the Company's balance sheet, (ii) Le Nature's had mischaracterized more than $8.5 million in expenses in 2005, thereby falsely inflating net income by more than 37%, and (iii) Le Nature's' chief executive completely dominated the Company and ignored and overrode the limited set of controls that were in place. BDO also knew that disclosing these facts, in the audit reports it drafted or otherwise, would cause widespread panic among Le Nature's investors, jeopardizing BDO's relationship with Le Nature's' management.

409. BDO substantially assisted the fraud committed by Le Nature's by certifying patently false financial statements and permitting those statements, with its signature and approval, to be distributed to investors, including Plaintiffs. By issuing such clean audit reports attesting to the fair presentation of Le Nature's' financial statements in conformity with GAAP, BDO enabled Le Nature's to perpetrate its fraud. BDO's assistance included, among other things, (i) issuing clean audit reports to accompany Le Nature's' annual financial statements for 2003, 2004, and 2005 even though BDO did not undertake the steps required to determine the veracity of those statements, (ii) determining on behalf of Le Nature's that the Company's lease obligations with respect to property and equipment for the Phoenix facility were operating leases, rather than capital leases, notwithstanding the applicable GAAP standards mandating their designation as capital leases, (iii) determining on behalf of Le Nature's that rental payments under operating leases should not be reflected as expenses, and (iv) failing to inquire of non-management employees whether they were aware of fraudulent conduct at the Company, notwithstanding BDO's knowledge of Podlucky's history of ignoring controls and his degree of control over the Company's finances.

410. Absent BDO's active and knowing participation, Le Nature's' fraudulent scheme could not have been perpetrated. As a direct and proximate result of BDO's actions, Plaintiffs suffered damages.

411. BDO's conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of Plaintiffs. BDO's conduct evinced a high degree of moral turpitude and demonstrated wanton dishonesty.

412. By reason of the foregoing, Plaintiffs are entitled to a judgment against BDO awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## ELEVENTH CAUSE OF ACTION

**(Against BDO for Negligent Misrepresentation)**

413. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

414. BDO held and continues to hold itself out as a professional accounting firm qualified to perform public accounting services, including independent audits. BDO has a duty to maintain, and should be held to, the generally accepted auditing and accounting standards by which an auditor is obligated to conduct an audit.

415. BDO executed engagement letters with Le Nature's with respect to its audits of Le Nature's' financial statements for each of the years 2003, 2004, and 2005. In each such letter, BDO stated that it would conduct its audit in accordance with GAAS, and that the objective was to express an opinion on Le Nature's' financial statements in conformity with GAAP. The letters were executed by BDO's Philadelphia, Pennsylvania office, whose personnel conducted the audits in Pennsylvania and issued the resulting audit reports.

416. BDO owed the duty to perform its audit work in accordance with GAAS not only to Le Nature's, but also to Le Nature's' investors, including the purchasers of Notes. BDO knew that its audit reports were being provided to Plaintiffs. As set forth in the Offering Memorandum, Le Nature's' independent auditors were required to provide annual audited financial statements to the Noteholders via the indenture trustee. In addition, the trust indenture for the Notes provided

that Le Nature's' independent auditor would support the Company's annual Officers' Certificate to the indenture trustee with confirmation that there was no Event of Default under the indenture. Thus, BDO knew and expected that its audit reports were being provided to the Noteholders and potential Note purchasers specifically for those parties to use and rely upon in determining whether to purchase and/or retain the Notes.

417. Additionally, in the course of their work for Le Nature's, Wachovia and BDO had extensive contacts with each other to discuss various issues relating to Le Nature's' financial condition, financial statements, and even the drafting of confidential information memoranda in connection with various Le Nature's financing transactions. As BDO was aware, Wachovia arranged and underwrote the Note Offering. Thus, BDO was further linked to Plaintiffs by providing and sharing information with Wachovia.

418. BDO knew that its audit reports and the accompanying financial statements were being provided to investors, including Plaintiffs; knew that the investors, including Plaintiffs, would rely on those audit reports and the accompanying financial statements; and was further linked to Plaintiffs through the provision of audited financial statements and other information to the indenture trustee and its communications with the Note Offering underwriter.

419. Additionally, BDO was in a position of unique and superior knowledge to the Noteholders regarding information about the operations and financial condition of Le Nature's. As the auditor and advisor to Le Nature's, BDO had substantial access to Le Nature's' management and financial records. The Noteholders, including Plaintiffs, did not have access to similar information.

420. Notwithstanding its professional obligation to audit Le Nature's in accordance with GAAS, BDO failed to do so. BDO did not exercise the professional skepticism that is a central element of a proper GAAS audit. Instead, BDO accepted, without adequate questioning or corroboration, information provided to it by Podlucky and other senior executives at Le Nature's. BDO knew that these few individuals, more than anyone else, would be motivated to, and were in a position to, misrepresent Le Nature's' finances, sales, and profits. Nonetheless, BDO failed

adequately to question the information provided by these few executives, as is required of an auditor acting in accordance with GAAS.

421. BDO's negligent conduct is demonstrated by the firm's many failings in connection with its audits of Le Nature's, including:

- BDO assisted Le Nature's in misclassifying more than $200 million in capital leases as operating leases, enabling the Company to keep the leases off of its balance sheet and thereby to represent that it was in compliance with mandated financial ratios;

- BDO assisted Le Nature's in misclassifying more than $8.5 million in rental expenses for fiscal year 2005, preventing the inclusion of those expenses on the income statement and falsely inflating the Company's net income;

- BDO failed to make fraud inquiries to non-executive employees, although it acknowledged that the executive employees were the most likely individuals to engage in substantial fraudulent conduct;

- BDO failed to report any findings with respect to the Report of the Special Committee that was convened following the resignation of the Company's CFO; and

- BDO failed, on information and belief, to obtain sufficient corroborating evidence from external sources.

422. As a result of its negligent conduct in performing the audits, BDO, contrary to its professional obligations, certified financial statements that were grossly incorrect, issued an improper clean audit report, and failed to advise the Noteholders of the massive fraud that was being committed at Le Nature's.

423. Prior to Le Nature's' collapse, when the Noteholders purchased their Notes, they did not know, and could not have learned, the true facts concerning the foregoing material misrepresentations and omissions.

424. In purchasing and retaining the notes, Plaintiffs reasonably relied upon and were induced to proceed by the foregoing negligent misrepresentations and/or omissions. The Noteholders justifiably relied on BDO's representations regarding the financial health and strength of Le Nature's and BDO's certification of Le Nature's' financial statements as being in compliance with GAAP.

425. Each of the Plaintiffs has been damaged by BDO's negligent conduct, misrepresentations, and omissions, which caused each of them to purchase or retain the Notes.

426. By reason of the foregoing, Plaintiffs are entitled to a judgment against BDO awarding Plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A. On the First and Second Causes of Action, directing Wachovia to pay compensatory and punitive damages in an amount to be determined at trial;

B. On the Third Cause of Action, directing Wachovia to pay compensatory damages in an amount to be determined at trial;

C. On the Fourth Cause of Action, directing Wachovia to pay damages to Plaintiffs that purchased Notes from Wachovia in an amount, to be determined at trial, sufficient to return those Plaintiffs to the status quo ante;

D. On the Fifth, Sixth, and Seventh Causes of Action, directing E&Y to pay compensatory and punitive damages in an amount to be determined at trial;

E. On the Eighth Cause of Action, directing E&Y to pay compensatory damages in an amount to be determined at trial;

F. On the Ninth and Tenth Causes of Action, directing BDO to pay compensatory and punitive damages in an amount to be determined at trial;

G. On the Eleventh Cause of Action, directing BDO to pay compensatory damages in an amount to be determined at trial;

H. Awarding Plaintiffs pre- and post-judgment interest at the rate allowed by law; and

I. Granting Plaintiffs such other and further relief as the Court deems just and proper.

DATED: April 28, 2008

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By: [signature]
John B. Quinn
Bruce Van Dalsem
David Azar

865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000

Attorneys for Plaintiffs